IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 114,582

In the Matter of CHARLES P. VAUGHN,
*Respondent*.

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Opinion filed March 4, 2016. Suspension.

*Michael R. Serra*, Deputy Disciplinary Administrator, argued the cause, and *Stanton A. Hazlett*, Disciplinary Administrator, was with him on the brief for the petitioner.

*Caleb Boone*, of Hays, argued the cause and was on the brief for respondent, and *Charles P. Vaughn*, respondent, argued the cause pro se.

*Per Curiam*:  This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against the respondent, Charles P. Vaughn, of Inverness, Florida, an attorney admitted to the practice of law in Kansas in 1981.

On June 15, 2015, the office of the Disciplinary Administrator filed a formal complaint against the respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC). The respondent filed an answer on July 6, 2015. A hearing was held on the complaint before a panel of the Kansas Board for Discipline of Attorneys on August 20, 2015, where the respondent was present by telephone and was represented by counsel. The hearing panel determined that respondent violated KRPC 1.2(a) (2015 Kan. Ct. R. Annot. 456) (scope of representation); 1.3 (2015 Kan. Ct. R. Annot. 461) (diligence); 1.4(a) (2015 Kan. Ct. R. Annot. 482) (communication); 1.15(d) (2015 Kan. Ct. R. Annot. 556) (preserving client funds); 8.4(c) (2015 Kan. Ct. R. Annot. 672)

1

(engaging in conduct involving misrepresentation); and 8.4(d) (engaging in conduct prejudicial to the administration of justice).

Upon conclusion of the hearing, the panel made the following findings of fact and conclusions of law, together with its recommendation to this court:

"*Findings of Fact*

. . . .

"8.     The respondent has also been admitted to the practice of law in other jurisdictions. In January 1987, the Florida Supreme Court admitted the respondent to the practice of law. In February 1988, the Colorado Supreme Court admitted the respondent to the practice of law. In July 1994, the Montana Supreme Court admitted the respondent to the practice of law.

"9.     On June 25, 2014, a report of referee was entered in the Supreme Court of Florida, in *Florida Bar vs. Charles Paul Vaughn*, in case number SC13-2150. The report provided as follows:

"REPORT OF REFEREE

. . . .

"II.     FINDING OF FACT

. . . .

"Narrative Summary of Case. In or around August 2010, respondent was hired to represent [E.D.] in a dissolution of marriage proceeding. [E.D.]'s fees were paid by his friend, [C.C.], by credit card in two separate payments, one in the amount of $2,500.00 for attorney fees,

2

and the other in the amount of $500.00 for costs. These funds were placed in an account Respondent referred to as his cost account. During the pendency of the matter, in or around December 2010, Respondent disbursed $75.00 of the cost funds for the services of a court reporter. There was no testimony presented that respondent removed his fees, which were non-refundable, from the cost account within a reasonable time period and there was no testimony presented that any other costs were incurred.

"The trial in the [E.D.] matter was scheduled for April 11, 2011. One of the matters of utmost importance to [E.D.] was that a court reporter be present for the trial. However, neither respondent nor his staff scheduled a court reporter and a court reporter was not present. The parties eventually reached a settlement agreement, the terms of which were presented to the trial judge.

"Opposing counsel prepared the proposed final judgment and forwarded it to respondent for review. Respondent requested that opposing counsel add a paragraph addressing the minor child's school attendance and issues related to tardiness. Other than that change, the evidence established that respondent sought no other changes to the proposed order and opposing counsel forwarded it to the trial court. Thereafter, respondent's office forwarded the proposed final judgment to [E.D.] for his review. Upon receipt of the proposed final judgment, [E.D.] immediately notified respondent by email and then spoke with his staff the next day, informing respondent and his staff that the proposed final judgment contained errors and that respondent should not allow the judge to sign the order as drafted. There was no evidence presented that respondent attempted to address the matter at that time with opposing counsel or the court. The trial court issued the final judgment, which was not consistent with the agreement between the parties, on May 9, 2011.

"Once [E.D.] received the signed final judgment, he notified respondent the order had not been corrected and that he wanted it to correctly reflect the parties' agreement. In an email, [E.D.] again pointed out his issues of concern and the fact that he had specifically requested that respondent stop the judge from signing the proposed final judgment because it did not reflect the agreement of the parties. While the evidence indicated there was some contact between opposing counsel and respondent's staff regarding the incorrect order, there was no testimony or evidence presented indicating respondent attempted to address the matter.

"An amended final judgment was submitted for the trial court's review. However, the correction made was of no significance to [E.D.]. The correction failed to address the child visitation and/or child support issues that [E.D.] had raised with respondent. Rather, the only correction made was more of a typographical correction, as testified to by opposing counsel, as it simply omitted a paragraph that had been placed in the proposed final judgment in error. The omitted paragraph indicated the parties had entered into a written settlement agreement when in fact the parties had reached an oral settlement agreement. The amended final judgment, which was entered on June 8, 2011, reflected the removal of that paragraph.

"As before, upon receipt of the incorrect amended final judgment, [E.D.] immediately notified respondent via email, in a rather direct fashion, that none of his issues of concern had been addressed. He demanded that respondent 'fix it.' In addition to the concerns related to child visitation and child support, [E.D.] also notified respondent that the billing invoice he had received contained double billings and other billing items that he questioned. In his correspondence to respondent, [E.D.] made it clear that once the order was corrected to reflect the agreement between the parties, then the issues regarding the billing would be discussed. However, the evidence presented failed to show that

4

respondent and/or his staff addressed the billing concerns raised by [E.D.].

"At or around the end of August 2011, respondent forwarded a corrected amended final judgment to [E.D.] for his review. In separate correspondence respondent also notified [E.D.] that he had a duty to pay respondent's outstanding attorney's fees and that if [E.D.] failed to do so, respondent would pursue all collection avenues available to him. The amount respondent notified [E.D.] he owed included the items for which [E.D.] had been double billed. Shortly thereafter, [E.D.] notified the respondent the corrected amended final judgment reflected the agreement between the parties. He also specifically outlined the issues he had with respondent's billing invoice and indicated that he believed he owed respondent substantially less than respondent was invoicing. In addition, he forwarded a $50.00 check, explaining that was the amount he would be able to pay respondent each month until respondent was paid in full. Respondent cashed the check. However, he failed to file the corrected amended final judgment and he failed to notify [E.D.] he would not agree to being paid only $50.00 a month.

"The evidence clearly and convincingly demonstrated respondent failed to correct or address the billing issues. Likewise, the evidence clearly and convincingly demonstrated while respondent cashed [E.D.]'s $50.00 check, respondent had no desire to enter into a payment plan with [E.D.], especially in an amount of only $50.00 per month and that respondent failed to address this issue with [E.D.]. Further the evidence clearly demonstrated respondent made a conscious decision at that time that he would not file the corrected amended final judgment until and unless he received the remainder of his representation fee.

"The evidence also established that [E.D.] failed to make any further payments to respondent. [E.D.] testified that he did not pay anything further because respondent failed to complete the representation

5

by filing the corrected amended judgment with the court. [E.D.] was clear that he believed respondent had a duty to complete the matter and that he was not going to pay until respondent performed the services for which he had been hired. The evidence further established that respondent did not take any steps to follow up on the matter nor did he move to withdraw.

"Thereafter, in or around January 2012, respondent forwarded [E.D.]'s file to a collection agency. Based upon the invoices entered into evidence and the testimony presented, respondent had not addressed the double billing issues prior to sending the matter to collections. Consequently, the collection agency was attempting to recover all funds on respondent's behalf, including funds that had been improperly double-billed.

"[E.D.] then sought recourse through the Better Business Bureau by filing a complaint in or around March 2012. He complained about respondent's conduct as [well] as the billing issues. It was only after [E.D.] had to resort to contacting the Better Business Bureau that respondent finally addressed the double billing issue. However, in responding to same, he implied that while he had corrected the billing issues, [E.D.] still refused to pay the fees owed. Upon review of the evidence, it is clear that the same day respondent responded to the Better Business Bureau is the same day he corrected his billing invoices. As such, the implication being made by respondent in his response to the Better Business Bureau was less than forthright. In addition to the foregoing, respondent also invoiced [E.D.] for the time spent addressing the Better Business Bureau complaint and did not remove the charge from the billing invoices until after The Florida Bar became involved. The evidence presented in this regard demonstrated that respondent either failed to review the billing invoices in timely manner and address the error, or he simply refused to do so because he was not being paid.

6

"However, respondent engaged in other, more serious misconduct than that discussed above. The evidence showed clearly and convincingly that respondent applied the remaining $425.00 of cost funds he received to pay a portion of his attorney's fees and that he did not receive his client's permission to do so. Respondent and his assistant testified that the cost funds were always in the cost account. The other evidence presented, which consisted of the billing invoices and a ledger card, which was prepared manually and at a much later date does not support respondent's nor his assistant's position in that regard. The ledger card does not comport with respondent's billing invoices and contains errors. When questioned about why the cost funds were not segregated on the invoices and why invoices always showed that the entire retainer paid was applied, neither respondent nor his assistant provided a credible answer. For example, on the April 11, 2011, invoice prepared by respondent's office, the total amount of attorney's fees incurred was $5,398.50. The total disbursement (for the court reporter) was $75.00. Thus, the invoice indicates the total fee and disbursements equaled $5,473.50, less the retainers applied of $3,000.00 for a balance due of $2,473.50. Lastly, the invoice lists the payment detail noting attorney fees of 2500/costs 500 for total payments of $3000.00. . . .

"Respondent and his assistant testified that the program simply worked that way and there was nothing that could be done. They testified that there was no way to ensure that the invoices the clients received accurately reflected how the payments were actually made. In essence, what respondent and his assistant testified to was that despite what the invoices stated, respondent did not use the remaining $425.00 towards his attorney's fees. This referee finds this testimony by respondent and his assistant lacking in credibility. Moreover, if respondent is to be believed, he did nothing to ensure that there was some type of notification to his clients the cost funds being held by respondent were not being used towards his attorney's fees. The invoices respondent provided to his clients clearly stated otherwise and the position espoused

7

by respondent, that there was simply nothing that could be done to accurately reflect how the funds paid by a client is disbursed, is untenable.

"The evidence and testimony presented in this regard clearly and convincingly established that respondent used the cost funds for a purpose other than that for which the funds had been provided. The evidence also clearly and convincingly established that respondent knew little about how the system worked. Likewise, the evidence and testimony clearly and convincingly demonstrated that respondent left the billing issues up to his non-lawyer staff and that he had little to do with it. This referee did not find that respondent's lack of knowledge and/or interest in how his billing system worked to be a valid excuse for the manner in which the cost funds were handled. Respondent's conduct was not a mere technical violation of the trust rules and was disturbing to this referee.

"Respondent similarly failed to properly and forthrightly address the issues related to the hiring of the court reporter. The evidence clearly established that a court reporter was not present at the dissolution trial on April 11, 2011, despite the fact [E.D.] had been emphatic that a court reporter was to be present for all court proceedings. In one piece of correspondence to [E.D.], respondent stated that a court reporter was present, but that since there was no trial, there was nothing for the court reporter to monitor. On the other hand, in response to [E.D.] approximately one year later, respondent stated that he had a court reporter on standby, but that he did not want to get stuck with the court reporter's bills like he had been stuck with his attorney's fees. This later response is clearly suspect.

"There was no credible evidence presented during the final hearing that, at the time of the trial in the [E.D.] dissolution matter, respondent had notified [E.D.] he owed additional attorneys fees, [E.D.]

8

had been presented with an invoice showing he owed additional attorney's fees, or [E.D.] had refused to pay any additional attorney's fees. Rather, the evidence established that respondent had been away on vacation and that he failed to obtain a court reporter and that his staff had either not been instructed to obtain a court reporter or had failed to do so. The evidence presented by respondent that he may have had or may have attempted to have a court reporter on standby was not sufficiently clear or supported by other testimony and evidence presented. This referee found respondent's testimony and insistence that he could have had a court reporter present self-serving and lacking in credibility.

"And finally, a grave concern to this referee was respondent's failure to submit the corrected amended final judgment to the trial court until some *two years* after the incorrect amended final judgment had been issued. Again, respondent did nothing to address this matter until after the bar's involvement. Further, the evidence established respondent failed to notify [E.D.] when he finally submitted the corrected amended final judgment to the trial court. By the time respondent filed the corrected amended final judgment and the trial court entered the order on July 23, 2013, *nunc pro tunc* to April 11, 2011, the parties involved have been forced to live with an incorrect order for more than two years. This referee finds this to be an intolerable breach of ethics.

"Respondent's testimony in regard to his failure to complete [E.D.]'s matter was especially troubling to this referee. Respondent fully recognized that his client's matter was not resolved due to respondent's lack of diligence and that his failure in this regard required his client to live with an incorrect order that harmed his client. Respondent made a conscious decision to hold his client's matter 'hostage' until he was paid. Respondent testified that if his client had just paid him a 'little more' he would have completed the matter and written the fees off. However, respondent's testimony is not credible and is clearly belied by his actual conduct. Respondent did absolutely nothing to fulfill his obligations to

9

his client because he allowed his own interests, that being paid, to over-ride his professional and ethical duty to his client.

"The evidence presented in this matter, by way of testimony and exhibits, clearly and convincingly established that respondent failed to abide by his client's decisions, that he failed to act diligently for his client, that he failed to properly and adequately communicate with his client, that he made misrepresentations to his client, that he used cost funds improperly, and that he harmed not only his client for his own gain, but in doing so, he also harmed the judicial system and our profession.

"III.    RECOMMENDATIONS AS TO GUILT

"I recommend that Respondent be found guilty of violating the following Rules Regulating The Florida Bar:

"4-1.2(a) Subject to divisions (c) and (d), a lawyer shall abide by a client's decisions concerning the objectives of representation, and, as required by rule 4-1.4, shall reasonably consult with the client as to the means by which they are to be pursued. A lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation. A lawyer shall abide by the client's decision whether to settle a matter. In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial, and whether the client will testify;

"4-1.3 A lawyer shall act with reasonable diligence and promptness in representing a client;

"4-1.4(a) A lawyer shall promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in terminology, is required by these rules; (2)

10

reasonably consult with the client about the means by which the client's objectives are to be accomplished; (3) keep the client reasonably informed about the status of the matter; and (4) promptly comply with reasonable requests for information;

"4-8.4(c) A lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation;

"4-8.4(d) A lawyer shall not engage in conduct in connection with the practice of law that is prejudicial to the administration of justice, including to knowingly, or through callous indifference, disparage, humiliate, or discriminate against litigants, jurors, witnesses, court personnel, or other lawyers on any basis, including, but not limited to, on account of race, ethnicity, gender, religion, national origin, disability, marital status, sexual orientation, age, socioeconomic status, employment, or physical characteristic; and

"5-1.1(b) Money or other property entrusted to an attorney for a specific purpose, including advances for fees, costs, and expenses, is held in trust and must be applied only to that purpose. Money and other property of clients coming into the hands of an attorney are not subject to counterclaim or setoff for attorney's fees, and a refusal to account for and deliver over such property upon demand shall be deemed a conversion.

"IV.    STANDARDS FOR IMPOSING LAWYER SANCTIONS

"I considered the following factors prior to recommending discipline:  the duty violated, the lawyer's mental state, the potential or actual injury caused by respondent's misconduct, and the existence of mitigating and aggravating circumstances. I also considered, pursuant to *The Florida Bar v. Liberman*, 43 So.3d 36, 39 (Fla. 2010) citing to the criteria enunciated in *The Florida Bar v. Pahules*, 233 So.2d 130, 132 (Fla. 1970) that the sanction recommended and imposed must be (1) fair

11

to the disciplined attorney, being sufficient to punish while at the same time encouraging rehabilitation; (2) fair to society, both in terms of protecting the public from unethical conduct and at the same time not denying the public the service of a qualified lawyer as a result of undue harshness; and (3) severe enough to deter others who might be tempted to engage in like violations. Finally, I considered the fact that the Court has moved toward stronger sanctions for attorney misconduct in recent years. *The Florida Bar v. Herman*, 8 So.2d 1100, 1108 (Fla. 2009) citing *The Florida Bar v. Rotstein*, 835 So.2d 241, 246 (Fla. 2003).

"The bar argued the following aggravating factors exist in this case: 9.22(b) dishonest or selfish motive; 9.22(d) multiple offenses; 9.22(h) vulnerability of the victim; 9.22(i) substantial experience in the practice of law and 12.1(b) actual harm to the client. Counsel on behalf of respondent argued the only two aggravating factors applicable in this case were 9.22(d) multiple offenses (due to the fact numerous rule violations were found) and 9.22(i) substantial experience in the practice of law.

"In mitigation, the bar acknowledged that 9.32(a) absence of a prior disciplinary record and 9.32(g) character or reputation were applicable in this matter. Respondent argued that not only were 9.32(a) and 9.32(g) applicable, but that 9.32(b) absence of dishonest or selfish motive; 9.32(c) personal or emotional problems; and 9.32(e) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; and 9.32(l) remorse also applied.

"After careful consideration of the aggravating factors as applied to the facts before me and the arguments made by the bar and respondent, I find not only were the aggravating factors of 9.22(b), 9.22(d), 9.22(h) and 9.22(i), applicable in this matter, but I also find aggravating factor 9.22(g) refusal to acknowledge wrongful nature of conduct applies.

"I find the mitigating factors for 9.32(a), 9.32(e) and 9.32(g) were demonstrated in this case. However, I did not find respondent lacked a selfish or dishonest motive [9.32(b)], nor did I find he demonstrated he suffered from personal or emotional problems [9.32(c)], and finally I did not find respondent demonstrated remorse [9.32(l)].

"In regard to the finding that these three mitigating factors are not applicable in this case, this referee determined respondent displayed dishonesty and selfishness. He made misrepresentations to his client, he used cost funds improperly, and he clearly placed his own interests above those of his client's. Further, the limited evidence presented during the hearing does not support a determination [*sic*] respondent's personal matters (he was engaged in personal post-dissolution proceedings) were so consuming and/or overwhelming that he could not reasonably fulfill his obligations to his client. Furthermore, if the nature of respondent's personal problems were such that he could not provide reasonable, competent, diligent representation to his client, then respondent had a duty to notify this client that he was unable to fulfill his obligations and assist his client in finding another attorney. And finally, while respondent expressed remorse during a mitigation hearing, and while he apologized to the referee, the legal profession, and his client, this referee found the apology insufficient and untimely. Moreover, there was no evidence presented that respondent had actually apologized to his client for failing to timely address his matters, for failing to properly communicate, for failing to abide by his client's instructions to have a court reporter present, and for forcing his client to seek assistance to the Better Business Bureau and The Florida Bar. Apologizing in a setting in which the client was not present is of little consequence.

"In this case, respondent, in essence, held his client's matter hostage in an effort to force his client to pay respondent's outstanding attorney's fees. The respondent clearly put his interests before those of

13

his client and his actions were knowing and deliberate. In determining that respondent refused to acknowledge the wrongful nature of his conduct, this referee is mindful of the numerous opportunities respondent had to address his client's concerns and the fact he failed to do so.

"In addition to the foregoing, I also considered the following Standards argued by the parties: 4.12 (suspension is appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client); 4.14 (admonishment is appropriate when a lawyer is negligent in dealing with client property and causes little or no actual or potential injury to a client or where there is a technical violation of the trust account rules or where there is an unintentional mishandling of client property); 4.42(a) (suspension is appropriate when a lawyer knowingly fails to perform services for a client and causes injury or potential injury to a client); 4.62 (suspension is appropriate when a lawyer knowingly deceives a client, and causes injury or potential injury to a client); and 7.2 (suspension is appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional and causes injury or potential injury to a client, the public, or the legal system).

"Respondent argued that his conduct in this case was an aberration and that the testimony of his character witnesses, which included but was not limited to, judges and other attorneys, supported him in this regard. He additionally argued that the mishandling of the cost funds was unintentional and that once errors (such as the overbilling) were pointed out to him, the errors were corrected. He also argued [E.D.] was not actually harmed because the [*sic*] he and his ex-wife were not abiding by the court's order and had not been. Further, respondent argued he was simply attempting to be paid for the services he had rendered, and that no misrepresentations had been made. And finally, respondent argued that the strength of his mitigation, which included not only his character and reputation, but also the fact he had

14

been a practicing attorney for 27 years without a blemish, he is a death-qualified attorney, he founded the local chapter of the Florida Association of Criminal Defense Lawyers and remains on the Board of Directors, and he provides numerous services to his local community as testified to by Dr. Douglas Alexander, supports a sanction of, at most, a public reprimand.

"The bar, on the other hand, argued the facts demonstrated respondent engaged in knowing, intentional misconduct, that he placed his interests above those of his client's and that his failure to act diligently created a situation in which [E.D.] chose to disobey the dictates of the court's order because it was incorrect. The bar also argued respondent took little interest in correcting billing errors or attempting to work with [E.D.] to address his most significant concerns. The bar further argued respondent failed to abide by [E.D.]'s instructions and then presented a less than forthright explanation to [E.D.] for his failure to do so. Finally, the bar argued respondent misused client cost funds by paying them to himself to offset attorney's fees. Therefore, the bar argued that, despite the significant mitigation shown, the egregious nature of the misconduct engaged in by respondent warranted a rehabilitative suspension.

"In determining respondent was guilty of the rule violations listed previously in this report, this Referee determined respondent's conduct was intentional and that the bar had met its burden in that regard. *See, The Florida Bar v. Fredericks*, 731 So.2d 1249 (Fla. 1999). Respondent had been notified timely by [E.D.] on more than one occasion that the order, as issued by the trial court, was incorrect. He had been told by [E.D.] that the visitation issues, which were of paramount importance to [E.D.], were not what he had agreed to and that he definitely wanted the order [*sic*] be fixed because he had already missed time with his child. Respondent was timely notified of the billing errors which went unaddressed by respondent until [E.D.] was forced to seek

15

the assistance of the Better Business Bureau. Respondent improperly used client cost funds and failed to rectify the situation until after the bar's involvement. In addition, respondent's testimony in regard to the hiring of a court reporter, which was also very important to [E.D.], was suspect.

"But, more importantly, respondent intentionally and deliberately held onto the corrected amended final judgment in an effort to force payment from [E.D.]. Respondent's conduct caused [E.D.] to live with an incorrect order for a period of two years, simply because respondent chose to put his interests before those of his client. Respondent deliberately acted in a manner that placed our system of justice in jeopardy. The lynch-pin of our legal system is that individuals adhere to the orders issued by our courts. Respondent knew the order was incorrect and that it had a negative impact upon his client, yet he did nothing and then attempted to justify his misconduct by arguing that his client was not abiding by the order anyway. This referee finds respondent's conduct in this regard and his attempt at justification to be especially egregious. This referee finds the following statement by the Supreme Court of Florida in *The Florida Bar v. Varner*, 992 So.224, 231 (Fla. 2008) especially applicable in this case: '[t]he profession of the practice of law requires lawyers to be honest, competent, and diligent in their dealings with clients, other lawyers, and courts. Clients expect no less from their lawyers and place great trust in lawyers in their times of need. Lawyers trust each other to accurately represent their clients' interests and courts trust lawyers to do the same.' Respondent failed to live up to the ethical standards expected of attorneys in Florida.

. . . .

". . . This referee is mindful of the fact that a recommendation of a rehabilitative suspension is consequential and that if imposed will have a significant impact on respondent. Likewise, this referee is mindful of

16

the fact that respondent has no prior discipline history and that the testimony and letters provided in mitigation support a determination is [*sic*] his well thought of in his legal community and his community at large. Nevertheless, respondent engaged in intentional, knowing, deliberate misconduct. He made misrepresentations, he mishandled client cost funds by applying them to his attorney's fees, he deliberately failed to finish his client's matter, despite knowing the order, as issued by the trial court was in error, solely because he had not been paid, and he failed to properly and adequately communicate and address issues with his client. This referee finds the misconduct in this case to be extremely serious and conduct that cannot and should not be tolerated. However, this referee does not find that respondent's misconduct warrants a one year suspension like that imposed in *Varner* and *Centurion*, but rather, that a ninety-one day rehabilitative suspension is appropriate.

"VI.    RECOMMENDATION AS TO DISCIPLINARY MEASURES TO BE APPLIED

"I recommend that Respondent be found guilty of misconduct justifying disciplinary measures, and that [*sic*] be disciplined by:

"A.    Ninety-one day suspension and until rehabilitation has been shown;

"B.    Letter of apology to [E. D.], within 30 days after the issuance of the order of the Supreme Court of Florida in this matter, with a copy provided simultaneously to the bar's headquarters office, 651 East Jefferson St., Tallahassee, Florida 32399-2300; and

"C.    Payment of the bar's costs in these proceedings, which are outlined below.

17

"10.     Based upon the referee's report, on September 26, 2014, the Supreme Court of Florida suspended the respondent from the practice of law for a period of 91 days for having violated Florida's equivalent to KRPC 1.2, KRPC 1.3, KRPC 1.4, KRPC 1.15(d), KRPC 8.4(c), and KRPC 8.4(d). The respondent's suspension in Florida began October 26, 2014. To date, the respondent has not applied for reinstatement in Florida.

"11.     Thereafter, Colorado and Montana imposed reciprocal discipline. On December 15, 2014, the Supreme Court of Colorado suspended the respondent's license to practice law in that state for 91 days. The respondent's license to practice law in Colorado will automatically be reinstated once the respondent is reinstated in Florida. The Supreme Court of Montana also suspended the respondent's license to practice law in that state for 91 days.

"*Conclusions of Law*

"12.     Based upon Kan. Sup. Ct. R. 202, the respondent's stipulations, and the above findings of fact, the hearing panel concludes as a matter of law that the respondent violated KRPC 1.2(a), KRPC 1.3, KRPC 1.4(a), KRPC 1.15(d), KRPC 8.4(c), and KRPC 8.4(d), as detailed below.

"Kan. Sup. Ct. R. 202

"13.     Kan. Sup. Ct. R. 202 provides, in part, as follows:  'A final adjudication in another jurisdiction that a lawyer has been guilty of misconduct shall establish conclusively the misconduct for purposes of a disciplinary proceeding in this state.' In this case, Florida, Colorado, and Montana entered final adjudications that the respondent was guilty of misconduct in those jurisdictions. Thus, the evidence of those final adjudications is conclusive evidence for purposes of this disciplinary proceeding.

"KRPC 1.2(a)

"14.     KRPC 1.2(a) provides, '[a] lawyer shall abide by a client's decisions concerning the lawful objectives of representation . . . and shall consult with the client as to the means which the lawyer shall choose to pursue. . . .' In this case, the respondent violated KRPC 1.2(a) when he

18

failed to file the corrected amended final judgment. Thus, the hearing panel concludes that the respondent violated KRPC 1.2(a).

"KRPC 1.3

"15.    Attorneys must act with reasonable diligence and promptness in representing their clients. *See* KRPC 1.3. The respondent failed to diligently and promptly represent [E.D.]. The respondent failed to promptly prepare and file a corrected amended final judgment. As the Florida referee pointed out, the respondent's lack of diligence caused his client to violate a court's order for 2 years. Because the respondent failed to act with reasonable diligence and promptness in representing his client, the hearing panel concludes that the respondent violated KRPC 1.3.

"KRPC 1.4(a)

"16.    KRPC 1.4(a) provides that '[a] lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.' The respondent violated KRPC 1.4(a) when he failed to keep his client adequately informed regarding the status of the case. Accordingly, the hearing panel concludes that the respondent violated KRPC 1.4(a).

"KRPC 1.15

"17.    KRPC 1.15(d) provides:

'(d)    Preserving identity of funds and property of a client.

(1)    All funds of clients paid to a lawyer or law firm, including advances for costs and expenses, shall be deposited in one or more identifiable accounts maintained in the State of Kansas with a federal or state chartered or licensed financial institution and insured by an agency of the federal or state government, and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:

19

(i)     Funds reasonably sufficient to pay bank charges
        may be deposited therein.

(ii)    Funds belonging in part to a client and in part
        presently or potentially to the lawyer or law firm
        must be deposited therein, but the portion
        belonging to the lawyer or law firm may be
        withdrawn when due unless the right of the
        lawyer or law firm to receive it is disputed by
        the client, in which event the disputed portion
        shall not be withdrawn until the dispute is finally
        resolved.'

When the respondent applied the $425.00 in costs to the outstanding attorney's fees, the respondent violated KRPC 1.15(d). Therefore, the hearing panel concludes that the respondent violated KRPC 1.15(d).

"KRPC 8.4(c)

"18.    'It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation.' KRPC 8.4(c). The respondent engaged in conduct that involved dishonesty, fraud, deceit, or misrepresentation when he (1) applied the cost funds which should have been held in trust to his attorney's fees, (2) double billed [E.D.], (3) stated that he had hired a court reporter, (4) led [E.D.] to believe that the corrected amended final judgment would be filed, and (5) stated that the cost funds were not applied to the outstanding attorney's fees. As such, the hearing panel concludes that the respondent violated KRPC 8.4(c).

"KRPC 8.4(d)

"19.    'It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice.' KRPC 8.4(d). The respondent engaged in conduct that was prejudicial to the administration of justice when he intentionally and deliberately held onto

20

the corrected amended final judgment in an effort to force [E.D.] to pay the outstanding attorney's fees. As such, the hearing panel concludes that the respondent violated KRPC 8.4(d).

"*American Bar Association*
*Standards for Imposing Lawyer Sanctions*

"20.     In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"21.     *Duty Violated*. The respondent violated his duty to his client to provide diligent representation and adequate communication. Additionally, the respondent violated his duty to his client to safeguard his client's property. Finally, the respondent violated his duty to the public to maintain his personal integrity.

"22.     *Mental State*. The respondent intentionally and knowingly violated his duties.

"23.     *Injury*. As a result of the respondent's misconduct, the respondent caused actual injury to his client and the legal profession.

"Aggravating and Mitigating Factors

"24.     Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following aggravating factors present:

"25.     *Dishonest or Selfish Motive*. The respondent made misrepresentations to his client, he used cost account improperly, and he placed his own interests above those of his client's. (The respondent established a special account which he referred to as his cost account which held cost funds so that his clients could pay their costs by credit card.) Accordingly, the

hearing panel concludes that the respondent's misconduct was motivated by dishonesty and selfishness.

"26. *Multiple Offenses*. The respondent committed multiple rule violations. The respondent violated KRPC 1.2, KRPC 1.3, KRPC 1.4, KRPC 1.15, KRPC 8.4(c), and KRPC 8.4(d). Accordingly, the hearing panel concludes that the respondent committed multiple offenses.

"27. *Substantial Experience in the Practice of Law*. The Kansas Supreme Court admitted the respondent to practice law in the State of Kansas in 1981. At the time of the misconduct, the respondent has been practicing law for approximately 30 years.

"28. Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following mitigating circumstances present:

"29. *Absence of Prior Disciplinary Offenses*. The only discipline received by the respondent previously was based upon the instant facts. The States of Florida, Colorado, and Montana each suspended the respondent for a period of 91 days. Additionally, the State of Florida required the respondent to establish that he has been rehabilitated, prior to reinstatement. Finally, the respondent is not eligible for reinstatement in Colorado until his license in Florida is reinstated.

"30. *The Present and Past Attitude of the Attorney as Shown by His or Her Cooperation During the Hearing and His or Her Full and Free Acknowledgment of the Transgressions*. The respondent fully cooperated with the disciplinary process. Additionally, the respondent stipulated to the facts and rule violations.

"31. *Previous Good Character and Reputation in the Community Including Any Letters from Clients, Friends and Lawyers in Support of the Character and General Reputation of the Attorney*. Prior to the misconduct in this case, the respondent was an active and productive member of the bar of Florida. The respondent also enjoyed the respect of his peers and generally

possesses a good character and reputation as evidenced by several letters received by the hearing panel. These letters are a testament to the respondent's general character and legal skills.

"32.     *Imposition of Other Penalties or Sanctions*. The respondent's licenses to practice law in Florida, Colorado, and Montana have each been suspended.

"33.     In addition to the above-cited factors, the hearing panel has thoroughly examined and considered the following Standards:

'4.12     Suspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client.

'4.42     Suspension is generally appropriate when:

(a)     a lawyer knowingly fails to perform services for a client and causes injury or potential injury to a client; or

(b)     a lawyer engages in a pattern of neglect and causes injury or potential injury to a client.

'4.62     Suspension is generally appropriate when a lawyer knowingly deceives a client, and causes injury or potential injury to the client.

'7.2     Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system.'

"34.     The disciplinary administrator recommended that the respondent be suspended for a period of 91 days. The respondent joined the disciplinary administrator's recommendation for reciprocal discipline of a 91 day suspension. The respondent, however, argued that he should be given credit for the period of suspension that he has served and continues to serve in Florida.

"35.     The hearing panel agrees that a 91 day suspension is in order in this case. Thus, based upon the findings of fact, conclusions of law, and the Standards listed above, the hearing panel unanimously recommends that the respondent be suspended for a period of 91 days. However, because the respondent's practice was located in Florida and has no Kansas clients, the hearing panel believes that the respondent's reinstatement in Kansas should be tied to his reinstatement in Florida. Accordingly, the hearing panel recommends that before the respondent be allowed to practice in Kansas, he be required to satisfy the disciplinary administrator that he is a lawyer in good standing reinstated to practice law in the State of Florida. The hearing panel is trying to ensure that in no event will the respondent be allowed to practice in Kansas, if he is not allowed to practice in Florida. *See In re Joslin*, 270 Kan. 419, 424 (2000).

"36.     Costs are assessed against the respondent in an amount to be certified by the Office of the Disciplinary Administrator."

## DISCUSSION

In a disciplinary proceeding, this court considers the evidence, the findings of the disciplinary panel, and the arguments of the parties and determines whether violations of KRPC exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); see Supreme Court Rule 211(f) (2015 Kan. Ct. R. Annot. 350). Clear and convincing evidence is "'evidence that causes the factfinder to believe that "the

truth of the facts asserted is highly probable."'" *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]).

Respondent was given adequate notice of the formal complaint, to which he filed an answer, and adequate notice of the hearing before the panel and the hearing before this court. The respondent did not file exceptions to the hearing panel's final hearing reports. As such, the findings of fact are deemed admitted. Supreme Court Rule 212(c) and (d) (2015 Kan. Ct. R. Annot. 369).

The evidence before the hearing panel establishes by clear and convincing evidence the charged misconduct violated KRPC 1.2(a) (2015 Kan. Ct. R. Annot. 456) (scope of representation); 1.3 (2015 Kan. Ct. R. Annot. 461) (diligence); 1.4(a) (2015 Kan. Ct. R. Annot. 482) (communication); 1.15(d) (2015 Kan. Ct. R. Annot. 556) (preserving client funds); 8.4(c) (2015 Kan. Ct. R. Annot. 672) (engaging in conduct involving misrepresentation); and 8.4(d) (engaging in conduct prejudicial to the administration of justice), and it supports the panel's conclusions of law. We adopt the panel's conclusions.

The only remaining issue before us is the appropriate discipline for respondent's violations. At the hearing before the panel, the office of the Disciplinary Administrator and respondent recommended that respondent be suspended from the practice of law in the state of Kansas for a period of 91 days. The hearing panel agreed that the appropriate discipline is a 91-day suspension. The panel further recommended that before the respondent be allowed to practice in Kansas, he be required to satisfy the Disciplinary Administrator that he is a lawyer in good standing reinstated to practice law in the state of Florida.

As stated in the final hearing report, respondent is not only licensed to practice law in Kansas and Florida, but also in the states of Montana and Colorado. The Colorado Supreme Court suspended respondent for 91 days as of December 15, 2014. The Montana Supreme Court suspended him for 91 days as of February 26, 2015.

At the hearing before this court, at which the respondent appeared, the office of the Disciplinary Administrator recommended that respondent be suspended from the practice of law in the state of Kansas for a period of 91 days. Respondent recommended that he be suspended from the practice of law in the state of Kansas for a period of 91 days retroactive to the date of the Florida suspension. Further respondent requested that when he is reinstated in Florida, he be deemed reinstated in Kansas.

We hold that respondent is to be suspended from the practice of law in the state of Kansas as of the date of this order until such time as he has satisfied the Disciplinary Administrator that he is a lawyer in good standing reinstated to practice law in the state of Florida. Further, after the state of Florida reinstates him in good standing, he may take the necessary steps to change his status from inactive to active in Kansas.

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that Charles P. Vaughn be and is hereby disciplined by suspension from the practice of law in the state of Kansas, in accordance with Supreme Court Rule 203(a)(2) (2015 Kan. Ct. R. Annot. 293), as of the date of this order until such time as he satisfies the Disciplinary Administrator that he is a lawyer in good standing reinstated to practice law in the state of Florida. Further, after the State of Florida reinstates him in good standing, he may take the necessary steps to change his status from inactive to active in Kansas.

26

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this opinion be published in the official Kansas Reports.